

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-09-00337-CR

KELLY MUNN                                                    APPELLANT

V.

THE STATE OF TEXAS                                                STATE

------------

## FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In three points, Appellant Kelly Munn appeals his conviction for murder. We affirm.

## II. Factual and Procedural Background

Munn was charged with the murder of Scott Sartain. A jury found Munn guilty of murder and assessed punishment at ninety-nine years' incarceration.[2]

---

[1]*See* Tex. R. App. P. 47.4.

Because Munn challenges the sufficiency of the evidence to support his conviction, we will address the evidence in greater detail below.

### III. Sufficiency of the Evidence

In his first and second points, Munn challenges the legal and factual sufficiency of the evidence to support his conviction for murder, but after Munn filed his brief, the court of criminal appeals held that there is no meaningful distinction between the legal-sufficiency and the factual-sufficiency standards. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (overruling *Clewis v. State*, 922 S.W.2d 126, 131–32 (Tex. Crim. App. 1996)). Thus, the *Jackson* standard, explained below, is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." We overrule Munn's second point.

### A. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This standard gives full play to the

---

[2]Munn was also convicted of engaging in organized crime, but he does not appeal this conviction.

responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778. The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13.

## B. Applicable Law

A person commits the offense of murder if he intentionally or knowingly causes the death of an individual. *See* Tex. Penal Code Ann. § 19.02(b)(1) (West 2011).

In a homicide case, the State is not required to produce a body. *See Fisher v. State*, 851 S.W.2d 298, 303 (Tex. Crim. App. 1993) ("[P]roduction and identification of the victim's body or remains is not part of the corpus delicti of murder."), *cert. denied*, 531 U.S. 1164 (2001). The State must show the death of the victim was caused by the criminal act of the defendant. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App.), *cert. denied*, 522 U.S. 844 (1997).

The jury charge included, and the indictment alleged, several manners and means by which Munn, acting alone or as a party, intentionally or knowingly caused Sartain's death: by a manner and means unknown to the grand jury, or "by kicking [Sartain] with his feet or by punching him with his hands or by preventing [him] from obtaining insulin in sufficient quantities to prevent his death when [Munn] knew that . . . Sartain was an insulin-dependent diabetic, or by a combination of any or all of the aforementioned means."

## C. Evidence

### 1. The Beating

On September 6, 2007, Sartain, a methamphetamine user and an insulin-dependent diabetic, stole his grandmother's checkbook, forged a check, and gave it to his friend Natalie Bazan to cash. Police arrested Bazan after the bank confirmed that the check was forged. Bazan's husband, Brian Johns, upset by Bazan's arrest, bailed her out, and then the two confronted Sartain in a back room at Munn and Alejandro Orona's house.

4

Johns and Bazan both hit Sartain, and when Sartain moved to the front of the house to leave, Munn and Orona joined in and beat Sartain with their hands and feet. Sartain covered his head and was knocked to the ground. Several people at the house yelled for Munn and Orona to stop, but they continued kicking and hitting Sartain. Bazan, Johns, and the other people in the house fled as the beating continued.

### 2. Brian Johns's Testimony

Johns testified about Bazan's arrest and his role in starting the fight with Sartain. He said that Munn and Orona joined in as the fight moved to the front of the house, and that Munn said, "Go to sleep, bitch," as he repeatedly hit Sartain in the head. He testified that Sartain did not fight back; that Johns told Munn and Orona to stop; and that he, his wife, and others left the house when Munn and Orona would not stop beating Sartain. Johns also said that several days after the fight, Munn called him and asked him to go to the store for him or to take Munn to the store and that when he arrived at the house, the house smelled like "something was rotting real bad." He saw Munn and Orona emerge from a back room containing a table on which saws and knives rested, and he saw Munn hold up Sartain's severed head. Johns ran out of the house to tell friends what he had seen.

### 3. Melissa Morante's Testimony

Melissa Morante testified that she saw Munn, Orona, and Johns beating Sartain. She stated that Munn was doing most of the beating—kicking and

5

punching Sartain—and that she and others left the house when Munn and Orona refused to comply with their pleas to stop beating Sartain. She testified that when she returned to the house the day after the fight, she heard moans coming from the garage. When she asked about the moaning, Munn told her to, "Just shut up, you're tripping," and "Shut up, don't say anything."

Morante also testified that between the time of her initial interview with Arlington Police Detective Jim Ford about the murder and her testimony before the grand jury, she had been arrested on unrelated drug charges. She stated that she did not tell Detective Ford or the prosecutor assigned to Munn's case about her arrest because she had reached a confidential deal to work as an informant for the Fort Worth Police Department (FWPD) in exchange for the drug charges being dropped. Morante confirmed that the State had made no promises to her at the time of her initial interview with Detective Ford, her testimony before the grand jury, or her testimony at Orona's trial. (Orona, also arrested for Sartain's murder, was tried separately before Munn.)[3] She admitted that just prior to Orona's trial, she had failed to meet the terms of her deal with the FWPD, and she was re-arrested on the drug charges. She also confirmed that in exchange for her truthful testimony at Munn's trial, the State had offered her a reduced sentence on those charges.

---

[3]*See Orona v. State*, No. 02-09-00182-CR, 2011 WL 679320 (Tex. App.—Fort Worth Feb. 24, 2011, no pet h.).

### 4. Rebecca Brauer's Testimony

Rebecca Brauer, who was not present at the beating, testified that she went to Munn and Orona's house a few days after the fight and that she heard Munn tell Orona to feed and water the "dog" as he pointed toward the garage. She said that after her visit, Munn and Orona—who normally had frequent visitors—"kind of closed the house down for a week or so." Brauer stated that when she returned to the house a week later, Munn and Orona were mopping the floor with Fabuloso cleaner, and that the house "smelled like a dead animal." She testified that after Munn and Orona had moved out of the house, Munn, while intoxicated, appeared scared as he expressed concern that crime scene technicians had examined the house. Munn stated that he had used bleach to clean up blood, and told her about blood in trash bags.

On cross-examination Brauer stated that Munn told Orona to feed and water the dog in Spanish—a language she understands "a little bit," but that she does not speak. Brauer, who testified in jail clothes because she was arrested the day of Munn's trial for failure to post bond on an unrelated misdemeanor-marijuana charge, stated that she was not testifying voluntarily and acknowledged that she had past drug convictions.

### 5. Sanjuana Garcia's Testimony

About a week after the beating, Sanjuana Garcia—who had fled from the house with Morante—returned to the house and noticed a strong dead animal smell. Garcia testified that between the time of her initial interview with Detective

7

Ford and her testimony before the grand jury, she and Morante had been arrested on unrelated drug charges. Like Morante, Garcia did not tell Detective Ford or the prosecutor assigned to Munn's case about her arrest because she had also reached a confidential deal to work as an informant for the FWPD in exchange for the drug charges being dropped. She admitted that just prior to testifying at Orona's trial, she had failed to meet the terms of her deal with the FWPD, that she was re-arrested on the drug charges, and that in exchange for her truthful testimony at Munn's trial, the State offered her a reduced sentence on the drug charges. On cross-examination Garcia admitted to smoking methamphetamines the day of the beating and confirmed that Munn was a "clean freak."

### 6. Dennis Osborne's Testimony

Dennis Osborne, Munn's best friend, who was not present at the fight, visited the house several days after the fight. He testified that Munn told him that he and Orona had beaten Sartain because he owed them money. Osborne said that Munn had asked him to check on Sartain in the garage and to feed Sartain a burger and get him something to drink but that Osborne refused because he "didn't want to be a part to [sic] any of this. I didn't want to believe any of it was true."

Osborne stated that on his next visit to the house, there were dryer sheets on all of the air conditioning vents, that Munn had Vicks Vapor Rub on his nose, and that Munn told Osborne that Sartain had died after Munn and Orona had

beaten him a second time, after Sartain had "got[ten] better and started screaming and yelling." Osborne confirmed that Munn knew that Sartain was diabetic while the beatings were occurring.

Osborne testified that later, during a barbecue cook-out at the house, Munn told Osborn that "he had just gotten rid of the problem . . . that [Munn and Orona] only had an arm and a leg left . . . ." Osborne confirmed that Clayton Miller and Shannon Marlowe were at the barbecue and that he later helped Miller and Marlowe load a beat-up black Grand Prix that was missing its hood onto a tow-dolly hooked up to a Chevrolet pick-up truck. The pick-up truck had a bathtub full of trash bags in its bed. Osborne testified that the bathtub had previously been in Munn's garage and that there was a maroon stain in the garage where the bathtub had been located. He said that Miller later told him that the Grand Prix was in Waco. Osborne also testified that sometime after the car was disposed of, Munn described and demonstrated to Osborne how he had cut up Sartain's body.

Osborne, in jail clothes, confirmed that he was in federal custody at the time he gave his initial statement to Detective Ford, that Detective Ford wrote his statement for him because he was dyslexic, that after Detective Ford read his statement to him, that Osborne dictated corrections to his statement, and that Osborne initialed those corrections. Osborne said that he declined Detective Ford's offer to speak to federal authorities or the parole board on Osborne's behalf; that his release from federal custody was not related to his statement;

9

and that three days prior to Munn's trial, the State arrested him for evading arrest. He stated that he was not testifying voluntarily and that in exchange for his testimony at Munn's trial, the State agreed to drop the evading-arrest charges.

On cross-examination, Osborne admitted that he had a history of selling drugs and that he told Munn's investigator (1) that he did not see any body parts, (2) that he felt pressured into his statement and his previous testimony, (3) that Detective Ford had threatened his freedom and told him what to say, (4) that he was worried because his urine had tested positive for drugs, (5) that his statement was "bullshit," and (6) that in "his heart" he knew that Munn was innocent. Osborne also stated that he had lied to Munn's investigator because he was scared of Munn, the State, and the defense, and that was why his statement to the police and testimony differed from what he told Munn's investigator. He further testified that Detective Ford told him that he had it out for Munn; that because he was already "doing time," he was not concerned about the results of his urine test; that Munn's electricity was off around the time of the beating; that because Munn lacked power, a big pot of chicken and dumplings spoiled on the stove; that Munn and Orona kept the house pretty clean; and that they threw all of their trash, including the spoiled chicken and dumplings, into the garage.

### 7. Joe Olivarez's Testimony

Joe Olivarez, who was not present at the beating, testified that he was a methamphetamine user and occasionally bought drugs from Munn and Orona, that he met Sartain several months before the beating at a house where they both purchased drugs, that Sartain lived with him for a while, and that he has not heard from Sartain since the day of the beating. He also stated that Sartain drove a black "Grand Prix or Monte Carlo."

Olivarez, in jail clothes, confirmed that he had been arrested for attempted forgery and that because he was a repeat offender, he was facing a twenty-five-year-to-life sentence on that charge. He also testified about his criminal history—that he had served a fifteen-year sentence for murder, that he had served six years for amassing three DWI charges in an eight-month period, and that he had also served nine months for possession of a controlled substance. He stated that a recent charge against him for being a felon in possession of a weapon had been dismissed because of insufficient evidence. He confirmed that once he finished testifying in Munn's case (in exchange for his guilty plea), the State would waive the repetition counts on his forgery charge, which would reduce the punishment range to that of a state-jail felony charge (six months to two years). He also confirmed that because he would get credit for time served, he would be released at the end of his duties as witness in Munn's trial.

### 8. Chris Barakat's Testimony

Chris Barakat, a self-employed auto-shop and U-Haul dealership owner in Arlington, testified that he rented a tow-dolly to Marlowe on October 22, 2007, and confirmed that the receipt stated that a Chevrolet half-ton pick-up truck would be used to tow a 2000 Pontiac Grand Prix. He said that he thought that the tow-dolly had not been returned "but [did not] know that information."

### 9. Joshua Schlasman's Testimony

Fifteen-year-old Joshua Schlasman testified that sometime in 2007, Clayton Miller and a woman driving a Chevrolet Z71 pick-up truck towed a beat-up black Pontiac Grand Prix to Waco and left it with Dayarl Matheny,[4] who Schlasman's family was living with at the time. Schlasman said that although the Pontiac car contained loose trash and was missing its hood, a bumper, the windshield, and some windows, it was still drivable. He also said that there was a bathtub filled with trash and tires in the bed of the pick-up. He testified that later that evening, he and his mother looked inside the trunk of the car, that he saw a clear bag with either "blood or transmission fluid on it," and that his mother quickly slammed the trunk shut. He said that they sold the bathtub and burned the trash bags and loose trash, and that Matheny cut apart the Grand Prix, burned out the interior, and sold the car as scrap metal. Although he told police

---

[4]Matheny was deceased at the time of Munn's trial.

in his initial statement that he did not see any blood or body parts, Schlasman testified that he thought he saw an arm in the trunk but that he could not be sure.

On cross-examination, Schlasman confirmed that he had not mentioned seeing any body parts in his prior testimony at Orona's trial. Later, after a bench conference, Schlasman was recalled for further cross-examination, and he stated that he had exaggerated in his testimony and admitted that he had not seen any body parts in the car.

### 10. Arlington Police Detective Jim Ford's Testimony

A few months after the beating, Detective Ford received a tip about a murder from an Arlington jail inmate. Detective Ford eventually tracked down witnesses and, approximately seven months after the beating, although Munn and Orona no longer lived there, the police searched the house and yard for evidence of a murder. Detective Ford testified that a chemical sprayed onto the walls and floors showed some areas that could have blood on them but that police were unable to perform further testing before the chemicals destroyed the potential DNA samples. He also confirmed that the blood samples that the police took from baseboards in the living room did not test positive for Sartain's DNA. Detective Ford stated that he located a badly damaged tow dolly in Waco that had been rented by Marlowe, that Sartain had been arrested shortly before his disappearance,[5] and that he had obtained information about the vehicle Sartain

---

[5]The record does not contain details about Sartain's arrest.

drove from impound records related to that arrest and from witnesses. He confirmed that Sartain had been listed as "missing endangered" in a database that is accessible to all law enforcement agencies and that he had not received any contacts related to Sartain's presence on the list.

On cross-examination, Detective Ford acknowledged that he was not testifying that the vehicle Sartain drove was registered to Sartain, and he confirmed that Munn had shown proof of insurance and paid the fee to retrieve the car from the impound. He also confirmed that in an unrelated November 2007 investigation of Munn's house,[6] the police analyzed eighteen swab-based samples of material from baseboards, walls, and a ceiling that they acquired for testing and found no evidence of Sartain's DNA. Detective Ford also stated that the room searched in November 2007 was not the room where the fight with Sartain had started. He agreed that the house contained no physical evidence that related to Sartain.

### 11. Jo Ann Mitchell's Testimony

Mitchell, Sartain's mother, testified that, after the forgery incident, she told Sartain that she never wanted to see him again. But she also explained that he was very close to his grandmother and visited her often and that neither she nor her mother had heard from Sartain after the day of the beating. She confirmed that Sartain had a car but said that she did not know what kind. She testified that

---

[6]The record does not indicate the details of this investigation.

14

Sartain was a "brittle diabetic" and that he had a history of complications and hospitalizations due to his heightened sensitivity to insulin.

## 12. Deputy Tarrant County Medical Examiner Lloyd White's Testimony

Dr. White testified that he had reviewed Sartain's medical records from 2005 to 2007, that too much or too little insulin causes brittle diabetics to become ill very quickly. He also said that, based on Sartain's medical records, a person with a similar medical condition who was subjected to a serious injury—such as the beating Sartain experienced—would be more vulnerable to death than a person without the same medical condition. Specifically, Dr White stated that "any kind of injury . . . exacerbates the effects of diabetes" and that the most serious effect would be ketoacidosis which could result in sudden death.

## 13. Defense Witnesses Testimonies

Charlotte Youngquist, Munn's mother, and Amy Garcia, Munn's sister, testified that while they were both visiting Munn in jail before trial, they heard Johns, who was working in the jail's visiting area, speak to Munn on the jail's phone-intercom system. They both said that although they could only vaguely hear Munn's side of the conversation, they heard Munn ask Johns why he lied, and that Johns responded that the police made him do it.

Melissa Gutierrez, the mother of Munn's children, testified that she and Munn broke up in 2003, that they shared parenting of their two children, that their parenting activities occasionally evolved into romantic encounters, and that she

and her children were at Munn's house the weekend of the beating. She said that she arrived at Munn's house at 7:30 p.m. on Friday, September 7, 2007, that a tattoo artist present at Munn's house gave her a tattoo, and that she remembered the date because she acquired the tattoo the weekend before her mother's birthday on September 13. She also said that Munn, Orona, and the tattoo artist were the only people at Munn's house on Friday; that she spent Friday night at the house; that the next morning, she retrieved her children from another residence and returned with them to Munn's house where they all spent Saturday night; and that she and her children left the house on Sunday. Gutierrez said she returned to Munn's house on Thursday, September, 13, 2007, and spent the night. She testified that during this time, she had not observed anything out of the ordinary, had not smelled anything unusual, and was not restricted from entering any part of the house.

On cross-examination, Gutierrez admitted that although she had visited Munn at least thirty times in jail, she did not alert Munn's attorney to the facts in her testimony until the week of the trial.

## D. Analysis

Munn argues that the evidence is insufficient to prove that Sartain is deceased or that Sartain was murdered. Specifically, he argues that although the evidence shows that Sartain is missing, the evidence is insufficient to show that Sartain owned the Grand Prix, that there is no evidence linking Munn to

Sartain's death, and that each of the state's key witnesses suffered from "significant credibility issues."

## 1. Witness Credibility

As noted above, the trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art 38.04; *Brown*, 270 S.W.3d at 568. The jury may choose to believe or disbelieve all or any part of any witnesses' testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986), *cert. denied*, 488 U.S. 872 (1988). Likewise, reconciliation of conflicts in the evidence is within the exclusive province of the jury. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996), *cert. denied*, 522 U.S. 832 (1997).

Morante, Garcia, and Osborne all appeared before the jury in jail clothes. They all testified about the reasons behind their arrests, any deals made with the State related to their testimonies, and whether they were testifying willingly or not. In addition, although Johns admitted that he started and participated in the fight with Sartain, his testimony that he left when Munn and Orona refused to stop beating Sartain was corroborated by Morante's and Garcia's testimonies. Osborne testified that Munn admitted that Sartain had died after a second beating and that Munn said that he had dismembered Sartain's body. Moreover, the jury heard Osborne and Olivarez testify that Sartain drove a black Grand Prix, and the jury heard Schlasman's testimony that Miller and a woman had disposed of such a vehicle.

The jury was fully aware of the deals between the witnesses and the State regarding the witnesses' pending offenses and the circumstances surrounding their decisions to testify, and Munn questioned the witnesses about these issues. *See id.*; *see also Douglas v. State*, No. 05-06-00198-CR, 2006 WL 3742902, at *3 (Tex. App.—Dallas Dec. 21, 2006) (mem. op., not designated for publication) (noting that a jury was free to decide if a witness testified truthfully or was influenced by his agreement with the State), *cert. denied*, 552 U.S. 1246 (2008). And, even though the jury heard Schlasman admit that he exaggerated about seeing body parts, the jury was free to believe his testimony that Miller delivered a black Grand Prix to the chop-shop in Waco. *See Sharp*, 707 S.W.2d at 614. Likewise, the jury was free to disbelieve any or all of Gutierrez's testimony about her presence at the house at the time of the events in question. *Id.* And, the jury was free to determine that the Grand Prix was Sartain's car. *Id.*

## 2. Sufficiency

Munn also argues that his conviction is not supported by an extrajudicial confession or a body and, thus, the evidence is legally insufficient to establish the *corpus delicti* of murder. But the record reflects that Munn told Osborne—a party not present at either beating—that Munn and Orona beat Sartain a second time and that Sartain died as a result. Thus, Munn admitted that Sartain died as a result of Munn's intentional actions, and we are left to determine whether the independent evidence corroborating Munn's extrajudicial confession renders the commission of Sartain's murder more probable than it would be without the

18

evidence. *See Williams v.* State, 958 S.W.2d 186, 190 (Tex. Crim. App. 1997); *Fisher*, 851 S.W.2d at 302–03; *see also Gonzales v. State*, 190 S.W.3d 125, 130 (Tex. App.—Houston [1st. Dist.] 2005, pet. ref'd) (noting that a defendant's extrajudicial confession corroborated by independent evidence tending to establish *corpus delicti* is sufficient to uphold a conviction), *cert. denied*, *Gonzales v. Texas*, 549 U.S. 1000 (2006).

Munn argues that "a review of all th[e] testimony fails, even in the light most favorable to the verdict that the jurors could infer that [Munn] murdered Mr. Sartain, dismembered the body, put it in a car and had it burned . . . because no physical evidence corroborated this alleged carnage." Munn misstates the State's burden. The State was not required to show how Munn disposed of Sartain's body or personal property, but testimony about Munn's actions relative to those events could serve as evidence to prove that Munn murdered Sartain; the State was required to show beyond a reasonable doubt that Munn murdered Sartain as alleged in the indictment. *See Swearingen v. State*, 101 S.W.3d 89, 96 (Tex. Crim. App. 2003).

Here, the evidence reflects that Sartain disappeared after a beating witnessed by multiple parties; that Munn knew that Sartain was diabetic and needed insulin; that Munn told Orona and Osborne to give Sartain, who was in the garage, some food and water; and that a short time later multiple witnesses reported a foul odor at Munn and Oronoa's home—where Sartain was last seen. Additionally, a week after the beating, Munn stopped receiving guests, he

attempted to mask the odor with dryer sheets and Vick's Vapor Rub, and he cleaned the house. Further, Johns saw Sartain's severed head and a tabletop full of knives and saws, Osborne saw a reddish stain on the floor of Munn's garage, and Munn described and demonstrated to Osborne how Munn had dismembered Sartain's body. Finally, months after moving out of the house, Munn told Brauer that he had cleaned up blood in the house and expressed concern that police were conducting forensic testing in the home, and acquaintances of Munn's delivered a car similar to Sartain's to a chop-shop in an outlying county. We conclude that the independent evidence corroborates Munn's extrajudicial confession. Viewing the evidence in the light most favorable to the jury's verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that Sartain is deceased and that Munn intentionally and knowingly caused Sartain's death by one, or a combination, of the manners and means alleged in the indictment. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778; *Cardenas v. State*, 30 S.W.3d 384, 390 (Tex. Crim. App. 2000) (noting that all that is required in corroborating an extrajudicial confession is that some evidence makes the commission of the offense more probable than it would be without the evidence), *cert. denied*, 130 S. Ct. 2094 (2010); *see also Kitchens v. State*, 823 S.W.2d 256, 259 (Tex. Crim. App. 1991) (noting that when a jury returning a guilty verdict on an indictment charging several alternate manners and means, the verdict stands if the evidence is sufficient with respect to any of the acts charged), *cert. denied*, 504 U.S. 958

20

(1992); *Martinez v. State*, 723 S.W.2d 264, 265 (Tex. App.—San Antonio 1986, pet. ref'd) (holding that evidence that victim died as a result of a severe beating supported conviction for murder). Accordingly, we hold that the evidence is legally sufficient to support Munn's conviction, and we overrule Munn's first point.

## IV. Motion for Mistrial

In his third point, Munn argues that the trial court erred by denying his motion for mistrial during voir dire. Specifically, he complains that "unacceptable jurors were seated on the jury panel based upon receiving information in violation of Texas Code of Criminal Procedure article 35.16(a)(10)[,]" which limited his "ability to properly and specifically question all of the venire members."

## A. Standard of Review

We review a trial court's ruling on a motion for mistrial for an abuse of discretion and must uphold the trial court's ruling if that ruling was within the zone of reasonable disagreement. *Wead v. State,* 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). An abuse of discretion occurs "only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Cantu v. State,* 842 S.W.2d 667, 682 (Tex. Crim. App. 1992), *cert. denied,* 509 U.S. 926 (1993). A mistrial is an extreme remedy for prejudicial events occurring during the trial process and should be granted only when residual prejudice remains after curative measures are sought and denied in the trial court or "events are so emotionally inflammatory that curative instructions are not likely to prevent the jury from being unfairly prejudiced against the

21

defendant." *Young v. State*, 137 S.W.3d 65, 71 (Tex. Crim. App. 2004); *see also*

*West v. State*, 121 S.W.3d 95, 106 (Tex. App.—Fort Worth 2003, pet. ref'd)

(noting mistrial appropriate only when prejudice exists after objections have been

sustained and curative instructions given).  A motion for mistrial preserves error,

but the court of criminal appeals has stated that

> when a party's first action is to move for mistrial . . . , the scope of
> appellate review is limited to the question [of] whether the trial court
> erred in not taking the most serious action of ending the trial; in other
> words, an event that could have been prevented by timely objection
> or cured by instruction to the jury will not lead an appellate court to
> reverse a judgment on appeal by the party who did not request
> these lesser remedies in the trial court.

*Young*, 137 S.W.3d at 70.

## B.  Applicable Law

Prospective jurors are not challengeable for cause merely because they

have heard news reports about the crime or the suspect.  *See Ladd v. State*, 3

S.W.3d 547, 561 (Tex. Crim. App. 1999), *cert denied*, 529 U.S. 1070 (2000).  A

prospective juror is subject to being excused if he has a bias or prejudice against

the accused or has formed a conclusion as to the guilt of the accused that would

influence his verdict.  Tex. Code Crim. Proc. Ann. art. 35.16(a)(9), (10) (West

2006).  Any juror who can put aside any bias, prejudice, or conclusion of guilt and

base his verdict on the evidence presented in court may serve on the jury at the

trial court's discretion.  *Barber v. State*, 737 S.W.2d 824, 829–30 (Tex. Crim.

App. 1987), *cert. denied*, 441 U.S. 967 (1979); s*ee also Von Byrd v. State,* 569

S.W.2d 883, 890 (Tex. Crim. App. 1978), *cert. denied*, 441 U.S. 888 (1979).

22

Defense counsel has the burden to ask questions to elicit information implicating a juror's inability to be impartial, truthful, and the like, and ask follow-up questions after uncovering potential bias. *Jones v. State*, 596 S.W.2d 134, 137 (Tex. Crim. App. 1980), *overruled on other grounds by Sneed v. State*, 670 S.W.2d 262, 266 (Tex. Crim. App. 1984); *Freeman v. State*, 168 S.W.3d 888, 891 (Tex. App.— Eastland 2005, pet. ref'd), *cert. denied*, 547 U.S. 1208 (2006); *see also Webb v. State*, 232 S.W.3d 109, 113 (Tex. Crim. App. 2007) ("It is incumbent upon counsel to specifically ask questions which will determine whether they have a right to challenge the venire member."); *Armstrong v. State*, 897 S.W.2d 361, 363–64 (Tex. Crim. App. 1995) (recognizing that defense counsel has burden to ask questions to determine a juror's potential bias). Even when a juror withholds information, a conviction will only be reversed if the defendant exercises due diligence in attempting to elicit that information. *Jones*, 596 S.W.2d at 137; *see also Armstrong,* 897 S.W.2d at 363–64.

**C. Voir Dire**

During Munn's portion of voir dire, a panel member asked about the ramifications of remembering parts of the crime from newspaper coverage. Munn then asked the entire panel if "[a]nybody else . . . thinks they know something about the case?" The five jurors answering affirmatively were identified as Victor Jones, Richard Hintermeier, Troy Rackliffe, James McClure, and William Olcsvary. After asking the entire panel this single question about

23

prior knowledge of the case, Munn moved onto a new topic and made no further inquiries about media exposure during the remainder of his voir dire.

## D. Individual Questioning

At the conclusion of voir dire, the trial court individually questioned nineteen panel members, including the five identified above.

### 1. Victor Jones

Jones was the third venire person questioned individually by the trial court.[7] Jones indicated that during the lunch break, he had looked the case up on the internet and learned that "the gentlemen was homeless . . . [,] the [dispute] was over a check[,] and . . . they cut up a car." In response to the trial court's question as to whether the information had led him to form an opinion as to Munn's guilt, Jones replied "I'd be more swayed to say yes more so than not." Munn then asked the trial court to determine if Jones had spoken to anyone else about the case:

The Court: Did anybody else -- did you talk to anybody else about it?

[Jones]: There was [sic] four of us. They all raised their hands. We all got the names and numbers.

The Court: They were reading it on Google?

[Jones]: Yeah.

---

[7]Munn did not ask the first two of the nineteen venire persons questioned about their knowledge of, or exposure to, media or news stories about the case.

Prior to releasing Jones, the trial court instructed him not to discuss the case with anyone else. Citing article 35.16(a)(10), the trial court excused Jones from jury duty.

### 2. Richard Hintermeier

Hintermeier was the sixth venire person individually questioned.[8] Hintermeier indicated that because the victim's name sounded familiar, he looked the case up on the internet over the break and confirmed what he had remembered: that "there was a murder . . . , that a couple of people had been arrested . . . . [, and] that there was an indictment and a conviction." The trial court and both parties questioned Hintermeier about his ability to uphold the law and whether he had formed an opinion about Munn's guilt. In concluding the questioning of Hintermeier, the trial court asked if either party had any additional questions and the following exchange occurred:

> [Defense Counsel]: Yes, Your Honor. I've only been asking people questions about the subject they've been brought in for. If there were other challenges for people, I haven't -- in other words, if there were --
>
> The Court: Oh, no. We can deal with those.

---

[8]Munn did not ask the two venire members questioned after Jones and before Hintermeier about their knowledge of the case, discussions with other panelists, or exposure to news stories about the case.

25

Hintermeier was not questioned further after this exchange. The trial court indicated that it "was not satisfied in [its] discretion that [Hintermeier] could be impartial" and excused Hintermeier under article 35.16(a)(10).

### 3. Troy Rackliffe

Rackliffe, the seventh venire member individually questioned, went immediately after Hintermeier. Rackliffe indicated that he had "Googled" Munn's name. When asked if he could keep an open mind as to punishment, Rackliffe said: "[I]f the facts that [I] read are true and the jury says guilty, then I would go towards the higher end. . . . [i]n my mind you have murder and then you have extreme cases, and what I read was more extreme than just minor." Rackliffe indicated that he had read about Munn's "partner's" conviction but that he did not recall the sentence imposed. Rackliffe admitted to discussing the case with Jones but stated that he had not discussed the case with anyone else. The court excused Rackliffe.

### 4. William Olscvary

Olscvary went tenth.[9] He indicated that he had overheard information about the case while walking through the hallway outside the courtroom. He was not sure if the people discussing the case were venire members or if they were discussing something they had heard and not something they knew. He heard

---

[9]Munn did not ask the two venire members questioned between Rackliffe and Olscvary about their knowledge of the case, discussions with other venire members, or exposure to news stories about the case.

26

them speak about "the type of injury, something about . . . . [k]eeping someone from getting medicine and dying and some kicking and two people involved." He stated that he continued to listen because he thought they might be discussing the case, that "no names or anything were mentioned regarding who it was or when it happened[,]" and that, after lunch based on statements made during Munn's portion of voir dire, he realized that the conversation in the hallway concerned Munn's case. The trial court granted Munn's challenge for cause of Olscvary.

### 5. James McClure

McClure was questioned immediately after Olscvary. McClure indicated that he did not read anything about the case but that he had overheard a conversation between potential jurors in the hallway about information on the case that one of them found on the internet. He stated that there were three or four people engaged in the conversation and that he was about five feet away from them, "close enough that [he] couldn't not hear it." McClure noted that the entire panel was in the hallway at the time he overheard the conversation, that the parties were not whispering, and that he was unsure as to how many panelists were within "easy earshot" of the conversation, giving an estimate of as few as four to as many as fifteen. McClure was also excused for cause.

### 6. Remaining Venire Members

After McClure's questioning, Munn moved for a mistrial, arguing that the entire panel had been tainted and stating,

> I was under the impression from . . . Jones that the only persons he discussed this with were [in] the lunch environment and that they had all raised their hands and said they would come in and discuss the issue with us.
>
> Now two different panel members have indicated that this was said in the open hallway out loud where anyone could hear. At this point I believe that the panel itself has been tainted, and I would make a motion for a mistrial.

The trial court responded that it had "always thought it was just right in the hallway with three or four other people" and denied Munn's motion for mistrial. The trial court then granted Munn a running objection and resumed individual voir dire.

After McClure, another eight panelists were questioned. Munn did not ask the first seven panelists if they had any knowledge of, had been exposed to, or had overheard any information about the case. Michael Carter, the last panelist individually questioned, responded "No[]" when Munn asked if Carter had "overhear[d] anything in the hallway, people talking about facts that could be relative to th[e] case[.]"

Only one of the nineteen panelists individually voir dired—Allen Elliot—was seated on the jury.[10] After the parties exercised their peremptory challenges, but before the jury was empaneled, Munn reiterated his running objection to the panel arguing "that the entire panel had been tainted by the conduct of five to six

---

[10]After the trial court and both parties questioned Elliot individually about his ability to follow the law in assessing punishment, the trial court denied Munn's challenge for cause.

28

panel members in the hallway."[11]  The trial court again overruled Munn's objection.  The trial court empaneled, but did not swear in, the jury; gave the jury members written instructions to review overnight; instructed the jury not to "listen to or read anything about th[e] case in the media . . . . [and to] not make any independent examinations or investigations . . . . don't Google, don't do anything like that[;]" and released the jury for the evening.

The next morning, before the jury was sworn in, Munn reiterated his objection to the panel and again moved for a mistrial, arguing that he "should have been allowed to explore any area of questioning which would have revealed a possible bias against [him] for preconceived opinions."  Munn argued that he was "not allowed" to question the panel as to the existence or effect of a potential bias and, therefore, "through no fault of [his own] . . . [he] was not able to effectively and intelligently use [his] peremptory challenges on persons who may have a preconceived opinion."  In response, the State stressed that Munn had "effectively questioned the panel after the incident" and that everyone who had indicated that he or she had any knowledge had ultimately been excused.  The trial court denied Munn's motion, noting that

> the [trial] [c]ourt is satisfied that based on the . . . questioning of the
> jurors that there were I believe three to four around the prospective
> juror . . . responsible for the internet transactions, all of those came

---

[11]The State indicated that other than having "a couple of more strikes" it had no objection to the composition of the jury.  Munn did not request additional strikes.

in and discussed their -- discussed what they saw. And as [the State] indicated, none of them made it on the jury.

The trial court again granted Munn a running objection based on its denial of his motion for mistrial and, though no request to quash the jury is in the record, the trial court also approved a running objection based on its failure to quash the panel. In its charges to the jury at both the guilt and punishment stages, the trial court instructed the jury that it was to consider only evidence presented at trial in reaching its decisions.

## E. Analysis

To support his contention that unacceptable jurors were seated on the jury panel in violation of article 35.16(a)(10) and that the trial court should have granted a mistrial, Munn relies on *Franklin v. State*, 138 S.W.3d 351 (Tex. Crim. App. 2004); *Robinson v. State*, 851 S.W.2d 216 (Tex. Crim. App. 1991), *cert. denied*, 512 U.S. 1246 (1994); and *Tijerina v. State*, 202 S.W.3d 299 (Tex. App.—Fort Worth 2006, pet. ref'd).

Munn's reliance is misplaced. In both *Franklin* and *Robinson*, the alleged error was discovered or occurred after the jury was empaneled and sworn in. *See Franklin*, 138 S.W.3d at 352 (noting that alleged error was discovered when State called complainant to testify); *Robinson*, 851 S.W.2d at 228–29 (recognizing potential error when, after the close of evidence in the guilt/innocence phase of the trial, juror indicated that her sister had told her about an article on the case in the prior day's newspaper). In *Tijerina*, the error

30

occurred immediately after the trial court denied defense counsel's request to reopen voir dire to ask a previously disallowed question in a different form. 202 S.W.3d at 301. Here, Munn discovered the potential bias during his portion of voir dire, and the trial court neither prevented him from questioning the panel to determine bias nor denied him the opportunity to reopen voir dire.

The record shows that Munn had the opportunity to, and did, ask the entire panel about knowledge of the case; that the five panelists who affirmatively answered were questioned individually and stricken for cause; that Munn had the latitude to ask any of the nineteen panelists questioned individually if they had overheard anything in the hallway related to the case; that Munn did, in fact, exercise this option on a single panelist and that the panelist answered in the negative; and that prior to seeking a mistrial, Munn did not seek a lesser remedy such as requesting an instruction or requesting to reopen voir dire to requestion the entire panel. *See Gonzales v. State*, 3 S.W.3d 915, 916–17 (Tex. Crim. App. 1999) ("We have consistently held, with respect to oral questions asked during voir dire, that error occurs where a prejudiced or biased juror is selected *without fault or lack of diligence on the part of defense counsel* . . . ." (emphasis in original, internal quotation omitted)); *Armstrong*, 897 S.W.3d at 363–64 (noting that defense counsel had obligation to ask follow-up questions after uncovering potential bias). Nothing in the record demonstrates that the trial court failed to investigate any prospective juror admitting knowledge of the case in violation of article 35.16(a)(10) or that any member of the seated jury was biased by

31

prohibited knowledge. *See* Tex. Code Crim. Proc. Ann. art. 36.15(a)(10); *Jones*, 596 S.W.2d at 134 (affirming denial of mistrial due to defense counsel's failure to ask any questions calculated to bring out the desired information); *cf. Uranga v. State*, 330 S.W.3d 301, 307 (Tex. Crim. App. 2010) (rejecting implied-bias doctrine argument and holding that standard of appellate review in denial of mistrial is "whether the trial court abused its discretion on the factual issue of actual bias"). Accordingly, we cannot conclude that actual bias existed or that the events complained of were so emotionally inflammatory that curative instructions would not have prevented the jury from being unfairly prejudiced against Munn. We cannot say that the trial court erred by denying Munn's motion for mistrial. *See Young*, 137 S.W.3d at 65, 71 (holding that because an objection and related instruction during voir dire would have cured harm resulting from improper questioning, the trial court did not err by denying appellant's motion for mistrial); *see also Gonzales*, 3 S.W.3d at 917–18 (affirming jury selection when defense counsel failed to ask questions to verify whether jurors failing to turn in questionnaires had been involved in criminal cases); *Jones*, 596 S.W.2d at 137 (finding no error when counsel failed to ask questions during voir dire that would have uncovered juror's previous employment at county jail and that she had served as a witness in a criminal trial). We overrule Munn's third point.

## V.  Conclusion

Having overruled all of Munn's points, we affirm the trial court's judgment.


                                                               BOB MCCOY
                                                               JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  June 16, 2011